IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | |
|---|---|
| BROTHERHOOD OF RAILROAD SIGNALMEN, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) Case No. 3:24-cv-05021-MDH |
| BNSF RAILWAY COMPANY, | ) ) |
| Defendant. | ) ) |

## ORDER

Before the Court is Defendant's Motion to Dismiss for Lack of Jurisdiction (Doc. 13). For reasons herein, Defendant's Motion is **GRANTED**. Plaintiff's Motion for Summary Judgment (Doc. 7) is **FOUND AS MOOT**.

## BACKGROUND

This case concerns a labor dispute between Brotherhood of Railroad Signalmen ("BRS"), an unincorporated labor organization with its headquarters in Front Royal, Virginia, and BNSF Railway Company ("BNSF"), a rail carrier that conducts rail operations in Missouri as well as the midwest, south, and west. The labor dispute centers around when an individual is considered hired for purposes of Section 2.C.2. of the Montana Rail Link ("MRL") Subdivision Agreement. The parties disagree as to whether the labor dispute is "major" or "minor" under the Railway Labor Act ("RLA") and to whom jurisdiction of the case is proper.

Section 2.C.2. of the MRL Subdivision Agreement states "[i]f the number of District 12 employees drops below 35, BNSF will either hire replacement employee(s) within sixty days to return to the level or all contractor employees will immediately be removed from the property."

On January 10, 2024 the number of Signalmen employed on the MRL Subdivision fell below 35. By February 13, 2024 Plaintiff notified BNSF officials and stated the 60-day period under Section 2.C.2. would run on March 10, 2024. BRS and BNSF engaged in negotiations to address the issue of BNSF restoring a full complement of Signalmen and their continued use of the positive train control ("PTC") contractor doing PTC-related signal work. On March 10, 2024, with no resolution, BNSF had the PTC contractor cease work on the MRL Subdivision. By March 21, 2024 BNSF informed BRS that it had made offers of signal employment to enough individuals that would bring the number of Signalmen to 35 and that the PTC contractor would resume work. The PTC contractor resumed work on March 21, 2024.

## STANDARD OF REVIEW

"Federal jurisdiction is limited by Article III, § 2, of the U.S. Constitution to actual cases and controversies." *Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000). A plaintiff's standing is a threshold question in every case that affects the court's power to hear the suit. *Id.* "To show Article III standing, a plaintiff has the burden of proving: (1) that he or she suffered an 'injury-in-fact,' (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury likely will be redressed by a favorable decision." *Id.,* citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). An injury-in-fact exists where the plaintiff has sustained, or is in immediate danger of sustaining, a concrete and particularized harm that is "'actual or imminent, not conjectural or hypothetical.'" *See Id.*

"In order to properly dismiss [a case] for lack of subject matter jurisdiction under Rule 12(b)(1), the complaint must be successfully challenged on its face or on the factual truthfulness of its averments." *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993). In a facial attack, the court "restricts itself to the face of the pleadings" and "the non-moving party receives the same

protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn v. United States*, 918 F.2d 724, 729 n. 6 (8th Cir. 1990). Dismissal is appropriate only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* In a factual attack, "the court considers matters outside the pleadings . . . and the non-moving party does not have the benefit of 12(b)(6) safeguards." *Id.* Dismissal is appropriate in such cases where, upon weighing the evidence, the court is not satisfied that the plaintiff has, in fact, proved jurisdiction. *See Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

## ANALYSIS

Defendant makes a factual challenge to the Court's jurisdiction. As such the Court may look outside the pleading. Defendant argues that the Court lacks subject matter jurisdiction because the labor dispute in Plaintiff's Complaint is properly classified as "minor" under the RLA. Defendants interpret the dispute as "minor" in that it requires interpreting and applying the plain terms of the MRL Subdivision Agreement. If the dispute is "minor" the RLA requires it be resolved through binding arbitration and not through the Court.

Where an employer asserts a contractual right to take a contested action, the ensuring dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement. *Consol. Rail Corp. v. Ry. Lab. Executives' Ass'n*, 491 U.S. 299, 299, 109 S. Ct. 2477, 2478, 105 L. Ed. 2d 250 (1989). Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major. *Id*. The difference between a major and minor dispute does not turn on a case-by case determination of the importance of the issue presented or the likelihood that it would prompt the exercise of economic self-help. *Id.* at 2481–82. Rather, the line drawn looks to whether a claim has been made that the terms of an existing agreement either

establish or refute the presence of a right to take the disputed action. *Id*. The distinguishing feature of such a case is that the dispute may be conclusively resolved by interpreting the existing agreement. *Id*. A minor dispute in the railroad industry is subject to compulsory and binding arbitration before the National Railroad Adjust Board. 45 U.S.C. § 153; *Consol. Rail Corp. v. Ry. Lab. Executives' Ass'n*, 491 U.S. 299, 303, 109 S. Ct. 2477, 2481, 105 L. Ed. 2d 250 (1989). The National Railroad Adjustment Board has exclusive jurisdiction over minor disputes. 45 U.S.C. § 153; *Union Pacific R. Co. v. Sheehan*, 439 U.S. 89, 93, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978).

For the Court to determine whether this is a major or minor dispute for purposes of the RLA, the Court must examine the labor dispute to see if it can be conclusively resolved by interpreting the existing agreement. The dispute revolves around Section 2.C.2. of the Montana Rail Link ("MRL") Subdivision Agreement. It reads:

> No contractor employees will be allowed to perform any [positive train control]-related signal work under this Agreement when there are fewer than 35 District 12 employees working. If the number of District 12 employees drops below 35, BNSF will either hire replacement employee(s) within sixty days to return to the level or all contractor employees will immediately be removed from the property.

(Complaint ¶ 10). On January 10, 2024 the number of Signalmen employed on the MRL Subdivision fell below 35. (Complaint ¶ 12). From that date, the 60-day period under Section 2.C.2. began to run. (Complaint ¶ 13). On February 13, 2024 BRS notified BNSF officials. *Id*. BRS and BNSF engaged in negotiations to address the issue of BNSF's restoring a full complement of Signalmen and their continued use of the PTC contractor. (Complaint ¶ 14). By the March 10, 2024 deadline BNSF had the PTC contractor cease work on the MRL Subdivision and removed them from the property. (Complaint ¶ 15). By March 21, 2024 BNSF informed BRS that it had made offers of Signal employment multiple individuals to raise the number of Signalmen to 35 and that the PTC contractor would resume work effective immediately.

(Complaint ¶ 16). Plaintiff contends that the number of Signalmen working on the Subdivision was still below 35 when the PTC contractor resumed work on March 21, 2024, abrogating and changing the parties' agreement. (Complaint ¶ 20). Defendant argues that enough individuals had accepted Defendant's offer of signal employment to bring the number of signal persons employed back to 35. Defendant states pursuant to Section 2.C.2., it was able to bring the PTC contractor back on the property.

This case, in essence, comes down to who is counted as hired for purposes of Section 2.C.2. of the MRL Subdivision Agreement. Defendant states three individuals had accepted BNSF's offers of employment which put BNSF back to 35 Signalmen as of March 18, 2024, and an additional three acceptances were made later putting the number to 38 by March 29, 2024. (Doc. 14-4, ¶ 8). Defendant has supplied the names and acceptance date of the new hires. (Doc. 21-1, page 2). Defendant has also included a seniority report of March 20, 2024. (Doc. 21-1, pages 4-5). Plaintiff attest that Defendant offered no documentation prior to this lawsuit substantiating the new hires or how it calculated 35 Signalmen on March 18, 2024, or 38 Signalmen on March 29, 2024. Plaintiff instead shows an updated seniority roster from Defendant as of April 15, 2024 to refute those claims (Doc. 19-1, page 15).

Defendant's March 20, 2024 seniority report does show 30 names of active Signalmen, all of which are reflected in the April 15, 2024 seniority report as well. (Doc. 21-1, pages 4-5; Doc 19-1, page 15). Further, Defendant has provided the names of six individuals, who accepted employment as Signalmen on or before March 20, 2024. (Doc. 21-1, page 2). Defendant hired an additional individual who acceptance an offer of employment as a Signalmen on March 29, 2024. *Id*. With 30 active Signalmen and six newly hired Signalmen, this would bring the number of Signalmen up to 36. This would permit Defendant to allow its PTC contractor to resume work

pursuant to MRL Subdivision Agreement Section 2.C.2 on March 21, 2024. Plaintiff's April 15, 2024 seniority roster shows 34 names counted for Section 2.C.2 purposes. (Doc. 19-1, page 15). Of those names, five are new hires Defendant showed as hired on or before March 20, 2024. However, they are listed as being new hires as of March 25, 2024 or April 15, 2024. The April 15, 2024 seniority report does not show the other two individuals hired by Defendant.

Depending on how "hired" is interpreted, it would affect the number of Signalmen as of March 21, 2024. If hired is considered when an individual accepts an offer of employment, then Defendant had a right to bring in the PTC contractor when the 35th Signalmen was hired on March 20, 2024. If its construed as when the new hire is reflected on the seniority report, then Defendant did not have a right to bring back the PTC contractor. The main issue here is one of interpretation. Defendant asserted a contractual right that was arguably justified by the terms of the MRL Subdivision Agreement. Since this dispute can be resolved based on an interpretation of the existing agreement, this dispute is considered "minor" for purposes of the RLA. The Court is divested of jurisdiction for this case to proceed to binding arbitration pursuant to 45 U.S.C. § 153.

## CONCLUSION

For the reasons set forth herein, Defendants Motion to Dismiss for Lack of Jurisdiction (Doc. 13) is **GRANTED**. Plaintiff's Motion for Summary Judgment (Doc. 7) is **FOUND AS MOOT**. It is **FURTHER ORDERED** that either party may submit this dispute to the National Railway Adjustment Board for resolution through arbitration pursuant to 45 U.S.C. § 153(i).

**IT IS SO ORDERED**.
DATED: October 21, 2024

                                            */s/ Douglas Harpool*
                                            **DOUGLAS HARPOOL**
                                            **UNITED STATES DISTRICT JUDGE**